## United States District Court
## Western District of Kentucky
## Louisville Division

Darryl G. Grigsby                                              Petitioner


v.                              Case No. 3:17-cv-463-CRS-CHL
                                Electronically Filed

Don Bottom, Warden
Northpoint Training Center                          Respondent

## Rule 5 Answer in Opposition to
## Petition for Writ of Habeas Corpus

## I. Summary Response

The Warden—Respondent—was directed to file an Answer and Response to Petitioner's request for a writ of habeas corpus. The Warden will first address this in a summary manner and then discusses the issues raised in more detail. Any allegation not specifically admitted herein is denied.

Grigsby raises a single ground for relief in his petition—ineffective assistance of trial counsel—which is divided into separate but interconnected allegations. Respondent denies that any part of his claim constitutes a violation of the United States Constitution. Thus Grigsby fails to state a claim for which relief may be granted.

1

Respondent has electronically filed all portions of the state court record pertinent to the issue including relevant pleadings. Respondent has consecutively paginated these and generally cites to them in footnotes by volume number and those page numbers since these have not yet been assigned a Page ID Number by the ECF system.

Relevant proceedings were video-recorded but there are no written transcripts of these proceedings. The trial court conducted no evidentiary hearings or trial. The Warden will file a copy of the trial court video record, which is relevant to one of Grigsby's allegations about counsel's performance, via conventional filing.

The Warden does not argue that Grigsby's claim is barred by the statute of limitations or the non-retroactivity doctrine. However, Grigsby adds allegations or sub-claims that he did not present to the state courts. The failure to exhaust them amounts to a procedural default, as will be addressed in Section IV, below.

**Statement of the Case**

## II. Factual Summary and Procedural Background in State Courts

## A. Factual Summary

While the trial court heard no testimony, the trial court record includes a volume of reports, interview transcripts, and other documents created during the investigation and provided to Grigsby's counsel in discovery. The trial court and the Kentucky Court of Appeals cited these records generally in their opinions and orders. (The Warden attaches relevant discovery documents from the state trial court file to this Answer. The Warden will provide a copy of the entire trial court file of discovery documents if this Court requests.)

On the early afternoon of Thursday, May 4, 2006, Nicole Hayes picked up her friend Tiphanie Durham at Durham's mother's house and took her to Plato's Closet to sell children's clothes. As they left the store, a male—Grigsby—stopped Durham, flirted with her, and offered to buy her an outfit.[1] She agreed, and he and another male followed them in

---

[1] A. Vol. 4, 265; A. Vol. 5, 305

his white Tahoe SUV to Jefferson Mall.[2] Grigsby did not buy the outfit, but they exchanged telephone numbers.[3]

At about 5:00 that evening Durham went out with another friend, Vanisha Burks. Durham brought her purse.[4] Burks took Durham to Grigsby's family's house on Wyandotte Avenue.[5] They intended to go to dinner, and Grigsby drove separately to pick up his cousin or friend. But Burks was summoned home, so Durham called Grigsby and he met them at a gas station. He was alone in his Tahoe when Burks left Durham with him.[6] Durham contacted Burks via mobile voice and text messaging later that evening, and told her that she and the man dined at O'Charley's, and were going to a park. Durham said that he had a large amount of cash—"eight stacks"—and she intended to rob him. Burks last heard from Durham between midnight and 1:00 a.m.[7]

---

[2] A. Vol. 5, 306–07, 310–11, 313

[3] A. Vol. 5, 307

[4] A. Vol. 5, 330–31

[5] A. Vol. 4, 270; A. Vol. 5, 326–27

[6] A. Vol. 5, 327–30

[7] A. Vol. 5, 331–33

Durham called Hayes at about 9:00 p.m., and told her she was with both of the men they met that day. She invited Hayes to join them, and said that the men had money and were ready to party. Hayes agreed to have them pick her up, but they never arrived.[8]

Durham also called her friend Jemaine "Bub" Russell that evening and early the next morning. When she spoke to him at about 7:00 p.m., she told him she was with a guy who carried ten or eleven thousand dollars, and that she needed some of it. He thought at the time she was joking. She called him back at about 4:00 a.m. and said she was at a hotel on Crittenden Drive. She was still with the guy, and she wanted Russell to help her rob him. Russell told her she needed to get out of there, and he offered to get her. She refused, and told him she was fine and that she would call him the next day.[9]

David Busby worked overnight May 4–5, 2006, at the Super 8 Motel at the corner of Crittenden Drive and Central Avenue. Durham came in at or shortly after 1:30 a.m. to rent a room, and she went back to the parking lot to get more money. A male that Busby identified as

---

[8] A. Vol. 5, 307–08, 322

[9] A. Vol. 4, 276–77

Grigsby followed her to the room. Durham came down about twenty-five minutes later and confided to Busby that she was thinking of robbing the man—Grigsby—but her friends had backed out and she did not want to be with him. She asked his advice, and he suggested that she claim to be on her period. She said that would just make him mad, and she returned to the room. When the two left at about 4:00 a.m., Grigsby seemed angry at Durham and would not respond to her.[10]

A resident of St. Anthony Woods Court—off St. Anthony Church Road—left his subdivision at about 5:45 a.m. and saw an unfamiliar white Chevy Tahoe or Blazer with chrome wheels and Vogue brand tires that included a whitewall and a gold pinstripe. A male black drove the SUV and another male black sat in the passenger seat. The windows were tinted and he could not see whether anyone else was behind them. The vehicle had come from the direction of Old Third Street.[11] (Burks had also described silver wheels and a gold outline.[12] Hayes believed the rims were gold and the tires were black.[13])

---

[10] A. Vol. 4, 272–73

[11] A. Vol. 4, 258–59

[12] A. Vol. 5, 327

[13] A. Vol. 5, 310–11

Overnight two high school students who camped on family property near St. Anthony Church Road heard a gunshot in the area. (One of them estimated it occurred at 2:00 or 3:00 a.m.)[14]

At about 6:45 a.m. a brother of one of the campers drove to that property with a coworker and found Durham's body—her clothing on fire—on the gravel portion of the access road that ran from St. Anthony Church road, between the property and St. Andrews cemetery. The fire department arrived five to ten minutes later and extinguished the body.[15] Durham was face down, severely burned and charred, with her hands and legs positioned as though she had been running. A hole the size of a quarter marked the back of her skull. Her clothing and the soil beneath her smelled of gasoline.[16] (Lab testing confirmed that the fire was fueled with gasoline.[17])

Durham's mother, Angela Booker, learned from Durham's friends Hayes and Burks that she was last seen with a male who drove a white Tahoe. They identified him by the nickname Ron Ron. Booker learned

---

[14] A. Vol. 4, 255

[15] A. Vol. 4, 255–56, 294–303

[16] A. Vol. 4, 289

[17] A. Vol. 5, 358

from the friends that the male lived at 2701 Wyandotte Avenue. She went there and was told by someone at the house that her daughter was with Darryl (Grigsby). Booker waited for Durham and Grigsby to return in the white Tahoe, but they did not.[18]

An autopsy revealed a contact perforating gunshot wound to the back of Durham's head. A fragment of the projectile exited through her nose, and a fragment remained. A separate projectile from a penetrating gunshot wound of indeterminate range remained in her left thigh. Perimortem incineration left diffuse thermal injuries throughout her body. Her mouth and on the top of her tongue contained soot. And she had a 13% blood carboxyhemoglobin saturation level.[19] (" 'Carboxyhemoglobin' is a 'combination of hemoglobin and carbon monoxide formed in the blood when carbon monoxide is inhaled with resulting loss of ability of the blood to combine with oxygen....' " *Century Sur. Co. v. Casino West, Inc.*, 677 F.3d 903, 905 n. 2 (9th Cir. 2012) (quoting *Webster's Third New International Dictionary of the English Language*, 336 (unabr.1993)).

---

[18] A. Vol. 4, 264–65

[19] A. Vol. 5, 354–55

An officer returned to the access road where Durham was found and used a metal detector to locate the separate projectile fragment that had passed through Durham's head into the gravel road.[20]

Monday, May 8, 2006, at 4:40 a.m. firefighters responding to a complaint of a burning vehicle off Grand Avenue extinguished a fire that was intentionally set with combustibles in the cab of the white Tahoe, which was in Grigsby's mother's name. The interior was heavily damaged.[21] It contained separate .40 caliber shell casings and projectiles that had "cooked off"—exploded—because of the fire, as well as the damaged remains of an ammunition magazine.[22]

Burks and another friend of Durham's—Henry Husky, Jr.— continued to call Durham's mobile phone through the weekend following her disappearance, even after she was identified. Finally a man answered the phone. He agreed to give up the phone, and Burks and Durham retrieved it from him at 18th and Oak Streets. Husky described the man—a black male in his forties who looked older than

---

[20] A. Vol. 4, 266, 290; A. Vol. 5, 350,

[21] A. Vol. 4, 279–281, 291–93

[22] A. Vol. 5, 351–52, 357, 362–63

that, and wore a black and red Indiana sweatshirt—as a crackhead. The man said he found the phone.[23]

The projectile taken from Durham's leg and the fragment collected from the gravel access road were both .40 caliber and were fired from an 8/right-rifled barrel—consistent with the Beretta .40 S&W caliber pistol. The caliber of the fragment taken from her head could not be determined, but the rifling impressions were similar to the other fragment and the projectile. The remains of the magazine recovered from the white Tahoe was a .40 S&W caliber size that was consistent with those used in Baretta pistols and others like it.[24]

Later in May, Grigsby's sister disclosed to a high school counselor and to a teacher that Grigsby killed Durham. She told the teacher that Grigsby had called their mother and told her he killed that girl on Derby night, and he had to burn the truck because of the blood inside.[25]

In March, 2007, police interviewed two inmates who were housed with Grigsby. One told them that Grigsby said he had to kill the

---

[23] A. Vol. 4, 268–69

[24] A. Vol. 5, 348–52, 362–63

[25] A. Vol. 4, 282–83

woman, and Grigsby provided details about where he set fire to the truck and for how long it burned. Grigsby said police would not get evidence from the truck. Grigsby also told the inmate that the police believed someone was with him.[26] The other inmate gave more details. Grigsby told that inmate the girl tried to set him up and rob him for eleven thousand dollars. Grigsby said he had taken her out to eat, and was already aware of the setup. Grigsby picked up his friend while she was in the car, then he confronted her about the setup. The friend choked her, and Grigsby shot her. They took her mobile phone and her purse, and Grigsby sent text messages to people so they would believe she was alive. Grigsby set her on fire and he set the truck on fire. Grigsby gave the girl's phone to an unknown man on 18th Street, and he bought that man a red Indiana shirt.[27]

---

[26] A. Vol. 4, 285–86

[27] A. Vol. 4, 287–88

## B. Trial Court Proceedings through Conviction and Sentence

Grigsby was indicted by a Jefferson County grand jury on May 31, 2006, for Murder, Robbery in the First Degree, two counts of Tampering with Physical Evidence, Arson in the Third Degree, Abuse of a Corpse, and being a Persistent Felony Offender in the Second Degree.[28]

The Commonwealth filed a Notice of Aggravating Circumstances that would render Grigsby eligible for the death penalty under KRS 532.025(2)(a)2. According to the Notice, "[t]he Commonwealth's proof at trial will demonstrate that the defendant killed the victim by shooting her to death during the course of a robbery."[29]

On October 5, 2007, Grigsby entered unconditional guilty pleas to Murder, two counts of Tampering with Physical Evidence, Arson in the Third Degree, and being a Persistent Felony Offender in the Second Degree.[30] The counts of Robbery in the First Degree and Abuse of a Corpse were dismissed at the Commonwealth's request, pursuant to the plea agreement.[31] Grigsby entered the pleas without admitting guilt,

---

[28] A. Vol. 1, 1–5

[29] A. Vol. 1, 6–7

[30] A. Vol. 1, 15–21

[31] A. Vol. 1, 17, 20

12

under *North Carolina v. Alford*, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970).[32] He was sentenced to serve life (without the possibility of parole for twenty years) for Murder. For each of the other substantive counts he was sentenced to serve five years enhanced to ten years, to run concurrently with each other and with the life sentence.[33]

## C. Direct Appeal

Grigsby appealed from his conviction and sentence. He claimed that he was not bound by his waiver of the right to appeal, and that he was not informed of his constitutional right to jury sentencing.[34] The Kentucky Supreme Court considered his claim as a *Boykin* challenge, which would survive his waiver of the right to appeal. And in examining that claim, the Court found that the trial court had complied with the mandates of <u>*Boyken*</u> and that Grigsby had voluntarily entered into the guilty pleas with an understanding of his rights. The trial court was not required to specifically inform Grigsby that he could enter a blind guilty plea and request jury sentencing. The Court affirmed the trial court

---

[32] A. Vol. 1, 15–16

[33] A. Vol. 1, 17–21

[34] A. Vol. 1, 28–46, 63–66

judgment. *Grigsby v. Commonwealth*, 302 S.W.3d 52 (Ky. 2010).[35] The

opinion was final February 11, 2010.[36] Grigsby did not seek certiorari at

the United States Supreme Court.

## D.  State Postconviction Proceeding

On August 5, 2010, Grigsby filed, *pro se*, a Motion to Vacate, Set

Aside, or Correct Judgment and Sentence Pursuant to RCr 11.42 and

RCr 10.26 with a request for an evidentiary hearing;[37] a memorandum

in support of the motion;[38] and related pleadings. In the motion and

memorandum, Grigsby claimed that ineffective assistance of counsel

resulted in a guilty plea that was not intelligently, knowingly, or

voluntarily given.[39] Specifically, he claimed: that his plea was coerced in

that his attorney did not want to risk the death penalty for Grigsby, and

advised him to take the plea offer;[40] that counsel failed to advise him

that no statutory aggravating circumstance would have supported the

---

[35] A. Vol. 1, 67–77

[36] A. Vol. 1, 67

[37] A. Vol. 2, 78–81

[38] A. Vol. 2, 82–127

[39] A. Vol. 2, 79, 90–106

[40] A. Vol. 2, 92

death penalty in his case;[41] that counsel failed to advise him about self-protection as a defense to (wanton) murder;[42] that counsel failed to advise him about extreme emotional disturbance as a defense;[43] and that counsel failed to challenge an eyewitness identification by hotel clerk David Busby.[44] Appointed counsel filed a supplementary pleading titled Submission Motion to Movant's Pro Se Motion to Vacate Pursuant to RCr 11.42.[45] In that motion, counsel restated Grigsby's *pro se* arguments, and added a related argument that Grigsby was prejudiced by the cumulative effect of trial counsel's deficient performances.[46] After the Commonwealth filed a response[47] and Grigsby filed a traverse,[48] the trial court issued an Opinion and Order denying Grigsby's motion.[49] The court found that counsel was not deficient in advising Grigsby that he

---

[41] A. Vol. 2, 95–96

[42] A. Vol. 2, 96–98, 100–01

[43] A. Vol. 2, 98–100

[44] A. Vol. 2, 102–05

[45] A. Vol. 2, 128

[46] A. Vol. 2, 128–29, 133

[47] A. Vol. 2, 140–45

[48] A. Vol. 2, 146

[49] A. Vol. 2, 154

faced the possibility of the death penalty and that he should accept the plea offer, given the charge of Robbery in the First Degree—an aggravating circumstance—and the evidence of Grigsby's guilt as summarized in the trial court's record of discovery documents.[50] The trial court also determined that neither the record nor Grigsby's own version of events (as contained in his verified pleadings) would have supported defenses of extreme emotional disturbance or self-protection. Thus counsel would not have been deficient in declining to pursue them.[51] Grigsby's appointed attorney filed a Motion for Amendment under CR 52.02 and Motion to Alter, Amend, or Vacat[e] Judgment under CR 59.05, which renewed Grigsby's request for an evidentiary hearing.[52] The trial court denied the motion.[53]

Grigsby appealed from the trial court's orders denying his motions.[54] The Kentucky Court of Appeals determined that Grigsby's claim of coercion was refuted by his statements during the guilty plea

---

[50] A. Vol. 2, 157–58

[51] A. Vol. 2, 158

[52] A. Vol. 2, 160

[53] A. Vol. 2, 160 (handwritten on first page of motion)

[54] A. Vol. 2, 169; A. Vol. 3, 171–202, 222–41

colloquy.[55] The record indicated that Grigsby faced the possibility of being sentenced to death, so counsel was not ineffective in advising him of that risk.[56] The Court of Appeals agreed with the trial court's assessment that the record did not support the defenses of self-protection or extreme emotional disturbance. Grigsby's *pro se* RCr 11.42 motion included his verified statement that the victim was shot accidentally while Grigsby struggled with an armed robber. That defense is distinct from self-protection and extreme emotional disturbance—so much that they are mutually exclusive.[57] Relating to Grigsby's claim that the counsel failed to challenge the motel clerk Busby's identification, the Court of Appeals cited Grigsby's admission during his guilty plea that the Commonwealth had sufficient evidence to convict him, his acknowledgment in his pleadings that an investigator for his attorneys interviewed Busby, and the fact that two other witnesses also identified him as being with the victim before she was murdered. Thus, even if counsel had challenged Busby's

---

[55] A. Vol. 3, 243–48

[56] A. Vol. 3, 247

[57] A. Vol. 3, 247–48

identification and the trial court had disallowed it, still it was extremely

unlikely that Grigsby would have insisted on going to trial.[58] Finally,

the Court of Appeals agreed with the trial court that Grigsby's claim did

not warrant an evidentiary hearing.[59] The Court affirmed the trial

court's orders.

On August 17, 2016, the Kentucky Supreme Court denied

Grigsby's request for discretionary review.[60] Grigsby did not request

certiorari from the United States Supreme Court.

## III. Petition under 28 U.S.C. §2254 for Writ of Habeas Corpus by a Person in State Custody.

On August 1, 2017, Grigsby filed a Petition for Writ of Habeas

Corpus Under 28 U.S.C. § 2254.[61] He claims violation of his right to

effective assistance of counsel under the United States Constitution.

His claim is not clearly separated into individual grounds, but he

alleges that counsel failed to properly investigate and challenge the

motel clerk's identification of him; failed to investigate Jemaine Russell

---

[58] A. Vol. 3, 248–50

[59] A. Vol. 3, 250–51

[60] A. Vol. 3, 253

[61] Petition, RE 1, Page ID # 1

as Durham's accomplice; failed to advise him about extreme emotional disturbance or self-protection; failed to file a timely notice of an intent to introduce evidence of mental disease or defect; misadvised him that he could receive the death penalty, and failed to properly represent and advise him in relation to plea negotiations.

## IV.   Procedural Default through Failure to Exhaust Remedies

Grigsby alleged in his RCr 11.42 action—as he does here—that his trial counsel's failure to challenge the motel clerk's identification kept him from pursuing his theory that Jemaine Russell was trying to rob him, with Durham's complicity, when she was shot. However, Grigsby's petition here adds to his complaint about the identification procedure an allegation that the motel clerk could not identify him the first time he was shown a photo array, so police showed the clerk a more suggestive array.[62] And he adds a second vague, general allegation that counsel also "never … pursued evidence relating to the second black

---

[62] Petition, RE 1, Page ID # 7, ¶ 31

19

male [Russell], Durham's accomplice."[63] Grigsby did not include these allegations in his state court pleadings or briefs.

Grigsby included in his post-conviction allegations at the trial court and Kentucky Court of Appeals that his trial attorney failed to advise him about the defense of self-protection and the mitigating defense of extreme emotional disturbance. But he did not allege there, as he does now, that counsel's untimely filing of a notice of intent to introduce expert testimony relating to mental disease or defect prevented him from pursuing a defense of extreme emotional disturbance.[64]

With respect to those sub-issues, Grigsby failed to exhaust his state remedies. And he cannot now raise them in the state courts, as Kentucky bars successive motions to vacate a conviction under RCr 11.42(3). *Sanders v. Commonwealth*, 339 S.W.3d 427, 438 (Ky. 2011) (citations omitted). So to the extent he raises the sub-issues in his petition, they are procedurally defaulted.

---

[63] Petition, RE 1, Page ID # 14, ¶ 62(1)

[64] Petition, RE 1, Page ID ## 8–10, ¶¶ 39–41, 47

"[A] claim is procedurally defaulted where the petitioner failed to exhaust state court remedies, and the remedies are no longer available at the time the federal petition is filed because of a state procedural rule." *Lovins v. Parker*, 712 F.3d 283 (6th Cir. 2013); *see also In re Abdur'Rahman*, 392 F.3d 174, 186 (6th Cir. 2004) (*en banc*) ("forfeiture by failure to exhaust" is a form of procedural default), vacated on other grounds by *Bell v. Abdur'Rahman*, 545 U.S. 1151, 125 S.Ct. 2991, 162 L.Ed.2d 909 (2005); *Coleman v. Thompson*, 501 U.S. 722, 735 n. 1, 111 S. Ct. 2546, 2557, 115 L. Ed. 2d 640 (1991) (petitioner who fails to exhaust state remedies and would be procedurally barred from bringing them in the state courts has procedurally defaulted for the purpose of federal habeas).

According to *Slaughter v. Parker*, 450 F.3d 224, 235–36 (6th Cir. 2006):

> Before seeking federal habeas relief, state prisoners must first exhaust their available state court remedies by fairly presenting all their claims to the state courts. *Whiting v. Burt*, 395 F.3d 602, 612 (6th Cir. 2005). Ordinarily, the exhaustion requirement is satisfied once the petitioner has fairly presented all his claims to the highest court in the state in which he was convicted, thus giving the state a full and fair opportunity to rule on those claims before the petitioner seeks relief in federal court. *O'Sullivan*

21

v. *Boerckel*, 526 U.S. 838, 842, 119 S.Ct. 1728,
144 L.Ed.2d 1 (1999). This can be done by
invoking one full round of the state's established
procedures. *Id.*

## V.   Standard of Review and Deference

## A. Standard of Review

The petition for habeas corpus relief was filed after April 24, 1996,

the effective date of the Antiterrorism and Effective Death Penalty Act

of 1996 (AEDPA). Therefore, AEDPA's substantive provisions apply.

*Lindh v. Murphy*, 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997);

*Harpster v. Ohio*, 128 F.3d 322 (6th Cir. 1997); *see also Walker v. Smith*,

360 F.3d 561, 563 (6th Cir. 2004). AEDPA prohibits federal courts from

granting writs of habeas corpus on claims previously adjudicated on the

merits in state court, unless that adjudication:

> (1) resulted in a decision that was contrary to, or
> involved an unreasonable application of, clearly
> established federal law, as determined by the
> Supreme Court of the United States; or (2)
> resulted in a decision that was based on an
> unreasonable determination of the facts in light
> of the evidence presented in the State court
> proceeding.

28 U.S.C. §2254(d).

The standard of review for habeas cases under the AEDPA has been interpreted by the Supreme Court in *Williams v. Taylor*, 529 U.S. 362, 402–413, 120 S.Ct. 1495, 1518–1523, 146 L.Ed.2d 389 (2000) (Part II of Justice O'Connor's opinion, joined by majority of the Court). The *Williams* opinion held that in assessing a legal ruling of a state court, a federal habeas court must first determine whether there was a controlling rule prescribed by the United States Supreme Court. If so, the federal court must determine whether the state court legal determination was an objectively unreasonable application of that rule. If there is no controlling rule, the federal court must determine whether the state court's decision resulted from an objectively unreasonable application of United States Supreme Court precedent.

For a state to have acted contrary to clearly established precedent, the Supreme Court must have decided a case differently which has "materially indistinguishable facts" than the state case. 529 U.S. at 413, 120 S.Ct. at 1523. The federal habeas court must determine the governing legal standard by reference to holdings (not dicta) of the Supreme Court that clearly established federal law governing state court trials at the time of the state court's ruling. 529 U.S. at 403–13,

23

120 S.Ct. at 1518–23; *Carey v. Musladin*, 549 U.S. 70, 127 S.Ct. 649, 166 L.Ed.2d 482 (2006) (applying *Williams* standard and holding the Ninth Circuit improperly cited its own precedent in determining state court had unreasonably applied clearly established Supreme Court precedent); *Ramdass v. Angelone*, 530 U.S. 156, 120 S.Ct. 2113, 147 L.Ed.2d 125 (2000) (applying *Williams* standard). Habeas relief is available only if "a state court unreasonably applies this Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error." *White v. Woodall*, 572 U.S. ---,134 S. Ct. 1697, 1706, 188 L. Ed. 2d 698 (2014). "Thus, 'if a habeas court must extend a rationale before it can apply to the facts at hand,' then by definition the rationale was not 'clearly established at the time of the state-court decision.'" *Id.* (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 666 (2004)).

The Supreme Court has reiterated that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Renico v. Lett*, 559 U.S. 766, 773, 130 S. Ct. 1855, 1862, 176 L. Ed. 2d 678 (2010) (quoting *Williams*, 529 U.S. at 410, 120 S.Ct. at 1522) (emphasis in originals). AEDPA imposes a highly deferential

24

standard of review of state court decisions. *Lett,* 559 U.S. at 773, 130

S.Ct. at 1862, citing *Lindh*, 521 U.S. at 333, n. 7, 117 S.Ct. 2067, n. 7.

"[E]ven a strong case for relief does not mean the state court's contrary

conclusion was unreasonable." *Harrington v. Richter*, 526 U.S. 86, 102,

131 S. Ct. 770, 786, 178 L. Ed. 2d 624 (2011), citing *Lockyer v. Andrade*,

538 U.S. 63, 75, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003).

Even where the state court summarily denies a claim without

explanation, the burden remains on Grigsby to show the state court had

no reasonable basis for denying relief. *Richter*, 526 U.S. at 98, 131 S.Ct.

at 784. The AEDPA standard is intentionally difficult for a petitioner to

meet. 526 U.S. at 102, 131 S.Ct. at 786. A writ should issue only "where

there is no possibility fairminded jurists could disagree that the state

court's decision conflicts with this Court's precedents." *Id.*

**B. Claims of Ineffective Assistance of Counsel: Double Deference**

In *Strickland v. Washington*, 446 U.S. 668, 104 S.Ct. 2052, 80

L.Ed.2d 674 (1984), the Court held:

> A convicted defendant's claim that counsel's
> assistance was so defective as to require reversal
> of a conviction or death sentence has two
> components. First, the defendant must show that
> counsel's performance was deficient. This
> requires showing that counsel made errors so

> serious that counsel was not functioning as the
> "counsel" guaranteed by the Sixth Amendment.
> Second, the defendant must show that the
> deficient performance prejudiced the defense.
> This requires showing that counsel's errors were
> so serious as to deprive the defendant of a fair
> trial, a trial whose result is reliable. Unless a
> defendant makes both showings, it cannot be said
> that the conviction or death sentence resulted
> from a breakdown in the adversary process that
> renders the result unreliable.

466 U.S. at 687, 104 S.Ct. 2064. A defendant is entitled to "reasonably

effective assistance" of counsel. *Id.* "Judicial scrutiny of counsel's

performance must be highly deferential." 466 U.S. at 689, 104 S.Ct. at

2064. Reviewing courts are required to "indulge a strong presumption"

that trial counsel's actions are reasonable in order to protect against the

"distorting effects of hindsight." *Id.* A limited investigation or even a

decision not to investigate may be reasonable. 466 U.S. at 691, 104 S.Ct.

at 2066.

The United States Supreme Court emphasized the objective

nature of the performance evaluation when it held a court must

presume trial counsel employed reasonable trial strategies even if trial

counsel did not actually consider those strategies. *Cullen v. Pinholster*,

563 U.S. 170, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011). There the United

States Supreme Court presumed a trial strategy never enunciated by trial counsel in postconviction proceedings. *Pinholster*, 131 S.Ct. at 1404. Reviewing courts must "affirmatively entertain the range of possible reasons" counsel may have proceeded as they did. 131 S.Ct. at 1407 (citations omitted).

In order to meet the prejudice requirement of *Strickland*, "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068. A court "must consider the totality of the evidence" in determining if the error deprived a defendant of a fair trial. 466 U.S. at 695, 104 S.Ct. at 2069. In the context of guilty pleas, the Supreme Court has modified the prejudice prong, requiring the defendant to prove that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and instead would have insisted on going to trial." Hill v. Lockhart, 474 U.S. 52, 59 (1985). A petitioner cannot make the prejudice showing merely by telling the court that he "would have gone to trial … if [he] had gotten different advice. The test is objective,

not subjective…." *Pilla v. United States*, 668 F.3d 368, 373 (6th Cir. 2012). Thus, "a petitioner must convince the court that a decision to reject the plea bargain would have been rational under the circumstances." *Padilla v. Kentucky*, 559 U.S. 356, 372 (2010).

According to the Sixth Circuit Court of Appeals, "[t]he critical issue is not whether counsel made errors but whether counsel was so thoroughly ineffective that defeat was snatched from the hands of probable victory." *United States v. Morrow,* 977 F.2d 222, 229 (6th Cir. 1992). In assessing a claim of ineffective assistance of counsel in a proceeding under 28 U.S.C. § 2254, the Supreme Court emphasized in *Richter*, "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential … and when the two apply in tandem, review is doubly so." 562 U.S. at 105, 131 S.Ct. at 788 (citations and internal quotation marks omitted).

Where a state court rejects the merits of a claim of ineffective assistance of counsel, the "pivotal question" in a § 2254 proceeding "is whether the state court's application of the *Strickland* standard was unreasonable" and this inquiry "is different from asking whether defense counsel's performance fell below *Strickland*'s standard."

*Richter*, 562 U.S. at 101, 131 S.Ct. at 785 (citations omitted). Stated differently, a "state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself" since the standards created by *Strickland* and section 2254(d) are both highly deferential. *Id.*

## VI.   Argument

The Kentucky state courts did not unreasonably apply clearly established federal law or unreasonably determine facts in ruling that Grigsby's trial counsel was not ineffective, under any of Grigsby's allegations or arguments.

## Counsel's failure to investigate and challenge the motel clerk's identification

Nicole Hayes, Vanisha Burks, and David Busby each identified Grigsby in a photo array as the man Durham was with.[65] Grigsby claims that counsel was ineffective in failing to investigate and challenge David Busby's identification.[66] The Kentucky Court of

---

[65] A. Vol. 4, 272, 274; A. Vol. 5, 334–35, 337–42

[66] Petition, RE 1, Page ID ## 7–8, ¶¶ 29-35

Appeals summarized and addressed Grigsby's argument at the state

courts:

> Grigsby's motion next questioned his counsel's alleged failure "to challenge the identification of Grigsby by witness David Busby," and he contends on appeal that the record did not refute this allegation. However, Grigsby's allegations are impermissibly broad; and they are refuted in the record.
>
> David Busby was a night clerk at the hotel Grigsby and his victim departed shortly before the murder. During the investigation, Busby was one of three witnesses who selected Grigsby's photo out of a photo pack as fitting the description of the person they saw with the victim the day of her murder. Grigsby specifically alleges that Busby only identified him in the photo pack because of "police misconduct which was never looked into by trial counsel."
>
> The record refutes Grigsby's allegation regarding Busby. We again point out that Grigsby, in entering an *Alford* plea, has admitted that the Commonwealth possessed sufficient evidence, including Busby's witness identification, to obtain a conviction. This was part of the record, and it must mean something. Additionally, by Grigsby's own admission, the Department of Public Advocacy interviewed Busby—an interview to which Grigsby's pro se motion repeatedly cites. Finally, Grigsby's motion acknowledges, but glosses over the importance of, the fact that two other witnesses identified him as being with the victim before the murder. Hence, it is exceedingly unlikely he would have insisted on going to trial even if Busby's testimony was challenged and disallowed.

> Grigsby's *pro se* allegations regarding Busby merely seek to reopen the investigation and relitigate the facts of the case against him. They are supported only by broad and conclusory accusations of unsubstantiated police misconduct and minute differences between his appearance and the description Busby provided. In the absence of more, we decline Grigsby's invitation to explore his allegations further.[67]

As the Kentucky Court of Appeals stated, Grigsby's allegations of police conduct in the identification process were broad and conclusory. He alleged there that the photo array—which was fairly designed with men of similar appearance who fit the witnesses' descriptions[68]—was somehow suggestive. He did not allege there that Busby was earlier unable to identify him in a separate photo array. So, as stated above, that aspect of his claim is procedurally defaulted.

Grigsby also never demonstrated what even a successful challenge to Busby's identification of him would have accomplished. Grigsby admitted in every version of his story that he was the individual in the motel room with Durham, and who left with her and drove her away in

---

[67] A. Vol. 3, 248–50

[68] A. Vol. 4, 265, 270, 274–75; A. Vol. 5, 311–12, 330, 337–42; Petition, RE 1, Page ID # 7, ¶ 30

his white SUV.[69] He emphasizes Busby's belief that the two got into a dark SUV,[70] but the detective's summary of his statement indicates Busby did not really know the color: "Mr. Busby said he saw them exit the lobby around 4:00 A.M. and get into what he believed to be a dark colored SUV with rims and leave. Mr. Busby also stated he wasn't paying a lot of attention to them once they left as to the vehicle."[71]

If there was any point to challenging Busby's observations, a trial would have been the setting for it. And Grigsby elected to not go to trial.

**Extreme emotional disturbance and self protection as defenses**

Grigsby complains that his trial attorney failed to advise him of the mitigating defense of extreme emotional disturbance[72] and of the defense of self-protection.[73] He fails to suggest how he could have invoked those defenses or received jury instructions for them, had he gone to trial.

---

[69] A. Vol. 2, 85–87, 126–27; Petition, RE 1, Page ID # 5, ¶ 20

[70] Petition, RE 1, Page ID ## 7–8, ¶¶ 32–33

[71] A. Vol. 4, 273

[72] Petition, RE 1, Page ID ## 5,8–12, ¶¶ 20, 36–49, 54

[73] Petition, RE 1, Page ID ## 12–13, ¶¶ 55–58

Grigsby attached to his motion to vacate at the trial court a summary of his statement to his trial attorneys. In that statement he claimed that after he and Durham left the hotel, he took her to her grandmother's house. Then he went to his mother's house, where a masked male robbed him of the Tahoe at gunpoint.[74] But in the body of his verified motion to vacate, Grigsby claimed that he was driving Durham to a park at her insistence, when he saw a dark SUV following them. He stopped to confront that driver, who came out of his SUV in a ski mask and pointing a gun. The gunman—Durham's accomplice—followed Grigsby back to the Tahoe, sat in the back seat, and robbed Grigsby and Durham. While the accomplice focused on Durham, Grigsby turned and tried to disarm him. He claimed that several shots were fired during the struggle, and Durham was hit several times and killed. Her accomplice fled. Grigsby panicked and set her body on fire.[75] Grigsby repeats the latter story in his petition here.[76]

---

[74] A. Vol. 2, 126

[75] A. Vol. 2, 87–88

[76] Petition, RE 1, Page ID ## 5–6, ¶¶ 20–24

In neither version of Grigsby's story has he engaged in the
intentional or wanton conduct required to support instructions for
extreme emotional disturbance or self-protection. According to the
Kentucky Court of Appeals:

> Regarding Grigsby's available defenses, the trial
> court found that the record did not contain
> sufficient evidence supporting the defenses of
> self-defense and extreme emotional disturbance.
> We agree.

> A defense of extreme emotion disturbance
> requires evidence that, at the time of a crime, the
> defendant was in "a temporary state of mind so
> enraged, inflamed, or disturbed as to overcome
> one's judgment, and to cause one to act
> uncontrollably from the impelling force of the
> extreme emotional disturbance rather than from
> evil or malicious purposes." *McClellan v.
> Commonwealth*, 715 S.W.2d 464, 468–69 (Ky.
> 1986). Likewise, a person acting in self-defense
> cannot be found guilty of an intentional criminal
> act. Kentucky Revised Statutes 503.020, *et seq*.

> As the trial court pointed out, Grigsby's own
> description of the events leading to the murder
> does not support his argument that his counsel
> should have informed him of, or asserted, these
> defenses. Grigsby's *pro se* RCr 11.42 motion
> alleges that an unidentified man in a ski mask
> was robbing him when he accidentally shot Ms.
> Durham. Hence, by Grigsby's own, apparently
> unwitting admission in the record, he would not
> have been entitled to an extreme emotional
> disturbance or self-defense instruction at trial. By
> his own account, his actions were accidental, a
> defense which is not only distinct, but mutually

34

> exclusive of the defenses of which Grigsby claims
> he should have been advised. *See Grimes v.
> McAnulty*, 957 S.W.2d 223 (Ky.1997).[77]

The Kentucky Courts did not violate established United States Supreme Court precedent in interpreting the defenses in Kentucky Statutes.

Grigsby's new argument—that counsel caused him prejudice by filing an untimely notice of intent to introduce expert testimony relating to mental disease or defect—is not only procedurally defaulted, it is also incorrect. On September 24, 2007, the date of a pretrial hearing, Grigsby's trial attorney filed a general Notice of Mental Health Testimony and Expert Testimony Relating to a Mental Disease or Defect.[78] During the hearing trial counsel indicated that the notice was a prophylactic measure:

> You see, it's technically not a motion. It's just a
> notice provided by the rule that we may intend to
> call a mental health expert. And we told them—
> the notice is out of the book, so it's fairly broad.
> But there's not—we don't intend there be a
> surprise. It's just in the event there's a mitigation

---

[77] A. Vol. 3, 247–48

[78] A. Vol. 1, 8

issue, a penalty phase issue, that's all that's
about.[79]

In response the Commonwealth filed requests for discovery of

expert reports and separately for exclusion of such expert testimony as

the notice was given eleven days before the October 5, 2007, trial date.[80]

As RCr 7.24 was written then, the defendant was required to give

twenty days' notice. But the rule also allowed that "[t]he court may for

cause shown allow late filing of the notice or grant additional time to

the parties to prepare for trial or make such other order as may be

appropriate." Supreme Court of Kentucky Order 2004-5.

Grigsby claims that the late notice prejudiced him in that the trial

court denied the expert testimony.[81] However, Grigsby does not identify

an expert who would have testified, or specific mental health testimony

that would have been elicited. And the trial court did not deny him the

ability to present expert testimony. The Commonwealth's tendered

---

[79] Video Record, Hearing, 9/24/07, 2:30

[80] A. Vol. 1, 124–25, 127–28

[81] Petition, RE 1, Page ID # 9, ¶¶ 40–41

orders were not signed,[82] and rulings on the Commonwealth's motions were obviated by Grigsby's guilty pleas on his trial date.

**Counsel's advice to Grigsby that he could receive the death penalty**

Grigsby claims that counsel was ineffective in incorrectly advising him that he could receive the death penalty.[83] But counsel was correct. In Kentucky an individual who kills a victim while robbing her may be sentenced to death. KRS 532.025(2)(a)2, (3); KRS 515.020(1). Grigsby states in his petition here that "[t]here is absolutely no evidence in the Record that Durham was ever robbed of anything whatsoever. The only possession of Ms. Durham's in the possession of another was a cellphone which detectives recovered from another man, Henry Husky, a friend of Ms. Durham's."[84]

Of course, because Grigsby pleaded guilty to the Murder and other offenses, no evidence was presented. But according to the reports in the state court record, the Commonwealth would have introduced evidence that Grigsby robbed Durham when he killed her. The Monday after the

---

[82] A. Vol. 1, 126, 129

[83] Petition, RE 1, Page ID ## 11–12, ¶¶50–53

[84] Petition, RE 1, Page ID # 11, ¶51

37

Friday morning murder Durham's friends Husky and Burks had retrieved her mobile phone from a man in a red and black Indiana shirt who hung out at 18th and Oak Streets after that man answered the phone.[85] Burks also told police that Durham had a purse when Burks took her to meet Grigsby.[86] While Grigsby was in jail he told another inmate, Marcus Owens, that he and his friend took Durham's mobile phone and purse after choking and shooting her. Grigsby used the phone to send text messages, then gave it to a man on 18th Street. He bought that man a red Indiana shirt.[87] Investigators did not recover Durham's purse, and the record does not indicate that they learned what Grigsby did with it.

Owens's statement to the detective was corroborated by other information in the record. A jury that heard the evidence summarized in the reports could have found that Grigsby robbed Durham as well as murdered her. Trial counsel would have been remiss in not advising Grigsby he faced the possibility of a death sentence.

---

[85] A. Vol. 4, 268–69

[86] A. Vol. 5, 330–31

[87] A. Vol. 4, 287

The Kentucky Court of Appeals properly determined that counsel's advice about the possibility of a death sentence was not ineffective:

> Express in Grigsby's *pro se* motion, and implied in his supplemental motion, is the allegation that trial counsel used an unwarranted threat of a jury's death sentence to persuade Grigsby to plead guilty when the death penalty was, according to Grigsby, legally improbable or impossible to obtain. The record shows that this was not the case.
>
> In a July 2006 pleading, the Commonwealth stated its intent to seek the death penalty under the theory that Grigsby murdered his victim in the course of robbing her. The Commonwealth pointed out that certain personal effects were missing from the victim's body. Hence, Grigsby undeniably faced a possible death sentence had the case proceeded to trial and had the Commonwealth proven its case. "Defense counsel's truthful warning that the death penalty was a very real possibility[ ]" is insufficient by itself to show coercion or involuntariness. *See* [*Commonwealth v.*] *Elza*, 284 S.W.3d [118, 122 (Ky. 2009)]. Grigsby's allegation of coercion is similarly insufficient.[88]

This determination was not an unreasonable application of clearly established federal law or an unreasonable determination of the facts.

---

[88] A. Vol. 3, 247

**Counsel's advice to plead guilty**

Grigsby alleges that trial counsel was ineffective in advising him to enter a guilty plea, such that his plea was not intelligently, knowingly, or voluntarily given. He incorporates his other arguments and adds vague assertions of a failure to investigate Jemaine Russell.[89]

Both the Kentucky Supreme Court and Kentucky Court of Appeals cited Grigsby's plea colloquy, which indicated that he knowingly, intelligently and voluntarily entered into the plea. The Supreme Court found the colloquy legally sufficient to establish that Grigsby understood the rights he waived.[90] The Court of Appeals found that it refuted Grigsby's claims it was involuntary or unknowing due to threats or improper advice by counsel.[91] That Court examined Grigsby's specific allegations and found—for the reasons stated in response to the sub-claims above—that nothing he alleged undermined the validity of the plea.[92]

---

[89] Page ID ## 13–15, ¶¶ 59–64

[90] A. Vol. 1, 72–76

[91] A. Vol. 3, 243–44, 246

[92] A. Vol. 3, 247–50

Grigsby claims that Durham was shot and killed in the Tahoe as he tried to disarm her masked accomplice, Russell, and that afterward Grigsby set her body on fire.[93] The discovery documents that were given to Grisby's trial attorney and included in the state court record indicated that Durham was still breathing when she was doused with gasoline and set on fire,[94] that she was found with her extremities extended out as though she had been running,[95] that her forehead had a gash that was consistent with a face-forward fall,[96] and that the projectile that entered the back of her skull broke into fragments—with a fragment remaining in her head and another fragment passing through into the gravel beneath.[97]

Based upon this, and other expected trial evidence summarized in this pleading, counsel's advice to Grigsby to enter a guilty plea was sound. The Kentucky Court of Appeals correctly held:

> Overall, we observe nothing improper in counsel's advice to Grigsby; nor do we see any apparent reason Grigsby would have insisted on proceeding

---

[93] Page ID # 6, ¶¶ 24, 26

[94] A. Vol. 5, 354–55

[95] A. Vol. 4, 289

[96] A. Vol. 4, 289; A. Vol. 5, 554

[97] A. Vol. 4, 266, 290; A. Vol. 5, 350, 354–55

> to trial. Grigsby faced possible death for a
> heinous crime. Under the circumstances, it was
> entirely reasonable for counsel to advise Grigsby
> to accept a plea that not only spared his life, but
> created the possibility of his parole after twenty
> years.[98]

This determination was not an unreasonable application of clearly

established federal law or an unreasonable determination of the facts.


## VII. Conclusion

The state courts' rejection of Grigsby's claims did not result in

decisions that were contrary to Federal law, unreasonable applications

of Federal law, or unreasonable determinations of the facts. And the

state court decisions in this case were not "so lacking in justification"

that they resulted in "an error well understood and comprehended in

existing law beyond any possibility for fairminded disagreement."

*Richter*, 562 U.S. at 103. The formidable threshold for granting habeas

relief has not been met because fairminded jurists could disagree on the

correctness of the state court's decision. *Yarborough*, 541 U.S. at 664.

Consequently, habeas relief should be denied.

---

[98] A. Vol. 3, 248

If this Court denies the petition, Grigsby is also not entitled to a certificate of appealability so as to proceed further. In order to obtain a COA, a petitioner must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To demonstrate this denial, the petitioner is required to show that reasonable jurists could debate whether, or agree that, the petition should have been resolved in a different manner, or that the issues presented were adequate to deserve encouragement to proceed further. *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000); *see also Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003). Grigsby fails to meet this standard.

## Relief

For the reasons stated above, this Court should deny the petition and deny Grigsby a Certificate of Appealability.

Respectfully submitted,

**Andy Beshear**
Attorney General

s/ James Havey
**James Havey**
Assistant Attorney General
Office of Criminal Appeals
1024 Capital Center Dr.
Frankfort, KY 40601
(502) 696-5342

james.havey@ky.gov

Dated: October 26, 2017

## Notice and Certificate of Service

I hereby certify that on October 26, 2017, the foregoing Rule 5 Answer in Opposition to Petition for Writ of Habeas Corpus, Rule 5 Attachment Index and Attachments, and the Respondent's tendered Order with the Clerk of the Court was electronically filed using the ECF system which will send notification of such filing to the following: Hon. Charles R. Simpson, III, Senior Judge; Hon. Colin H. Lindsay, Magistrate Judge; and Hon. Maureen Sullivan, Counsel for Petitioner.

s/ James Havey
**James Havey**
Assistant Attorney General